# United States Court of Appeals for the Federal Circuit

———————————

**BELL/HEERY, A JOINT VENTURE,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

———————————

2013-5002

———————————

Appeal from the United States Court of Federal Claims in No. 11-CV-0462, Judge Lawrence J. Block.

———————————

Decided: January 7, 2014

———————————

ROBERT D. WINDUS, Moore & Lee, LLP, of McLean, Virginia, argued for plaintiff-appellant. With him on the brief was RICHARD O'SHEA WOLF.

ELLEN M. LYNCH, Trial Attorney, Commercial Litigation Branch, Civil Division, of Washington, DC, argued for defendant-appellee. On the brief were STUART F. DELERY, Principal Deputy Assistant Attorney General, JEANNE E. DAVIDSON, Director, HAROLD D. LESTER, JR., Assistant Director, and DEVIN A. WOLAK, Trial Attorney.

———————————

Before PROST, MAYER, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* MAYER.

REYNA, *Circuit Judge.*

Bell/Heery, a Joint Venture ("BH"), appeals from the decision of the United States Court of Federal Claims dismissing its complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Rules of United States Court of Federal Claims ("RCFC"). *See Bell/Heery v. United States*, 106 Fed. Cl. 300 (2012) ("CFC Decision"). Because BH has failed to set forth facts sufficient to state a viable claim for the requested relief under the theories presented in its complaint, we *affirm.*

## BACKGROUND

This appeal involves a contract dispute between BH and the Federal Bureau of Prisons (the "FBOP" or "Government"). In April 2006, the FBOP issued a Request for Proposal ("RFP") soliciting bids for the "design-build" construction of a federal correctional institution in New Hampshire. The RFP detailed the specifications for the project and the duties of prospective contractors. In particular, the construction project involved a "cut-to-fill" site, meaning that the ground for the project had to be made level by excavating (or "cutting") materials from one area of the work site and using those materials to fill the lower areas. The contract mandated that the cut-to-fill operations be performed in compliance with the rules and regulations of the New Hampshire Department of Environmental Sciences ("NHDES"). These requirements included obtaining and complying with an Alteration of Terrain ("AOT") permit for the cut-to-fill operations.

The RFP included a section entitled "Certification, Codes, Regulations, and Permits," which included several

subsections regarding substantive and procedural obligations assumed by prospective bidders in addressing state-related permit requirements in their construction plans. RFP § C.4. First, the provision advised that the contractor would be responsible for "prepar[ing] the necessary documentation and forms required for the permits, and shall apply for, pay for and obtain all such permits and submit the application(s) for the FBOP." RFP § C.4(d)(1). Second, it advised that "[i]n preparing construction documents, the Contractor is to consult with appropriate officials of the State or a political subdivision of a State, or both, in which the project will be located, who would have jurisdiction if it were not constructed by a federal agency." RFP § C.4(e). Third, it indicated that "[i]n no case are the comments or recommendations of these officials to be implemented into the developmental documents without the approval of the FBOP." RFP § C.4(e)(3).

In addition to the foregoing explicitly recited obligations, the RFP further advised that "[t]he FBOP *Technical Design Guidelines* shall be referenced by the Contractor for additional requirements." RFP § C.4(d)(3). These requirements included a Technical Design Guideline ("TDG") entitled "Codes, Regulations, Laws, Permits and Variances." TDG 01415. The stated purpose of these guidelines was to "provide[] guidance to ensure that the Contractor obtains, reads, and complies with the terms and conditions of applicable permits . . . ." TDG 01415(A)(1). The "Regulations" section of these guidelines further states that a prospective "contractor should . . . become familiar with of [sic] all Federal Acquisition Regulation (FAR) clauses incorporated into this project." TDG 01415(C)(1). The Regulations section of the TDG expressly advises contractors that the FAR's "Permits and Responsibilities clause," set forth in 48 C.F.R. § 52.236-7, was incorporated into the contract and that it allocates all costs associated with obtaining permits to the Contractor "without additional expense to the Government":

> The requirements for permits on projects are regulated by FAR clause 52.236-7: "The Contractor shall, *without additional expense to the Government*, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. . . ."

TDG 01415(C)(1)(a) (emphasis added).

The TDG also reiterates many of the obligations specifically set forth in the RFP solicitation documents. For instance, the TDG provision entitled "Permits," places the duty of obtaining, paying for, and complying with permits on the contractor. TDG 01415(F). The TDG section concerning "State and Local Government Consultation, Review and Inspection" (the "Consultation, Review, and Inspection" provision) imposes obligations on the contractor to: consult with state officials when "preparing the design for the project"; "submit plans and specifications for the project in a timely manner for review" by state officials; "allow inspections by [state] officials during construction of the project"; and, in conjunction with the Government, "give due consideration to [state official's] recommendations and ensure that a written response is made to them." TDG 01415(D)(1)(a), (d), (e), (f). The TDG's Consultation, Review, and Inspection provision also states that "[t]he Contractor shall perform the [obligations regarding state official consultation, review, and inspection] in conjunction with the FBOP Project Management Team." TDG01415(D)(1); TDG01415(D)(1)(f).

Based on the criteria and obligations set forth in the solicitation documents, BH submitted its bid with a construction plan that assumed it would be granted a permit for cut-to-fill operations that would occur in a single step. Under BH's one-step-cut-to-fill plan, the cut materials would be directly transported to their final fill

locations without interruption. According to BH, the one-step-cut-to-fill plan was adopted because it was the most efficient process for completing the required cut-to-fill operations. Based on information provided in the Government's solicitation documents and its prior experience, BH believed the NHDES would approve an AOT permit for the one-step-cut-to-fill construction plan. As such, BH's bid price for the construction contract was calculated based on the assumption that the cut-to-fill work would occur in one step.

In May 2007, the Government selected BH's bid for the construction contract for a base sum of $238,175,000. The contract included a scheduled completion date of June 10, 2010, and provided liquidated damages in the amount of $8,000 for each day completion was overdue. The contract also included a number of express provisions and incorporated several Federal Acquisition Regulation ("FAR") provisions. In addition to the Permits and Responsibilities clause, the contract also incorporated the FAR's "Changes" clause, which describes the procedure by which the Contracting Officer can "make changes in the work within the general scope of the contract." 48 C.F.R. § 52.243-4(a). The Changes clause further states that, for any such ordered change that "causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under [the] contract," the Contracting Officer "shall make an equitable adjustment and modify the contract in writing." *Id.* § 52.243-4(d).

After BH was awarded the contract, it applied for state permits to begin cut-to-fill operations under the one-step-cut-to-fill plan. The NHDES rejected the application because it would not authorize BH to proceed under the proposed one-step-cut-to-fill plan. Instead, the NHDES informed BH that it would only authorize cut-to-fill operations that were limited to a forty-acre disturbance area, meaning that BH could only disturb a maximum of

forty-acres of land at any given time. This restricted the cut-to-fill work to an area substantially less than BH anticipated under its one-step-cut-to-fill plan. To comply with the forty-acre restriction, BH revised its plans for the initial phases of the cut-to-fill operations and submitted those plans to the NHDES for approval. The NHDES authorized BH to proceed with the plans for the initial phases of operations, but further required BH to submit plans for the subsequent phases for review and approval before BH could proceed with those additional phases.

BH advised the FBOP of the restrictions placed on the cut-to-fill operations by the NHDES and the potential ramifications of those restrictions on BH's performance under the contract. In a letter from BH to the Contracting Officer, BH indicated that the NHDES's requirements would "restrict our contractor's ability to complete the work based on the means, methods and durations anticipated in their [sic] bid." Additionally, BH advised that it had additional risk of being unable to meet the contract's performance deadlines since "the requirements for future phasing plan limitations are yet to be determined." With these considerations in mind, BH advised the government of the "potential exposure for addition[al] cost and schedule impact based on the requirements of the NHDES through the [AOT permit] and we are reserving our rights for additional compensation resulting from the requirement of amendment A of the [AOT permit] as well as future requirements of the permit." BH did not, however, refuse to proceed with construction under the restrictions imposed by the NHDES, nor did BH press the Government to directly intervene with the NHDES on BH's behalf.

After BH commenced work on the cut-to-fill activities, the NHDES imposed at least ten additional limitations on the cut-to-fill activities beyond the 40 acre disturbance limitation. Compl. ¶ 50. Under these additional limitations, the NHDES regularly prevented BH from directly

transporting cut materials to final fill locations and forced BH's earth-moving operations to involve several steps. BH alleges that these multi-step requirements "caused excessive re-handling and handling of materials, increased equipment and manpower needs, caused problematic stockpile management, required additional import materials, increased costs for erosion control measures, added temporary stabilization areas, required temporary stockpile stabilization, required additional areas of restoration and rework and necessitated work during unanticipated winter weather conditions." Compl. ¶ 55. Overall, the requirements imposed by the NHDES caused BH's cut-to-fill activities to proceed at a much slower pace and with greater costs than BH anticipated under the proposed one-step-cut-to-fill plan.

Throughout the duration of the cut-to-fill operations, BH repeatedly informed the Government of the restrictions imposed by the NHDES and their detrimental impact on BH's performance of the cut-to-fill activities under the contract. This occurred through several letters BH sent to the Contracting Officer and during progress meetings with various Governmental officials. Compl. ¶¶ 57-59. BH asserts that the Government never provided any written response to the notices it sent regarding the impacts caused by the NHDES's allegedly "unreasonable administration of the AOT Permit." Compl. ¶ 60. Additionally, BH alleges that during the partnering meetings, the Government, through two individuals associated with the FBOP, advised "that it would be treated fairly with respect to the extra work caused by the NHDES's administration of the AOT permit." Compl. ¶¶ 61, 75.

According to BH, the NHDES's restrictions went beyond the usual requirements of a standard AOT permit and were contrary to generally accepted industry practice. BH therefore, upon completion of the cut-to-fill operations, submitted a Request for Equitable Adjustment ("REA") to the Contracting Officer in the amount of

$7,724,885 for the excess costs it incurred relative to what it expected to incur under the original one-step-cut-to-fill plan. The Contracting Officer rejected BH's REA.[1] BH then filed suit in the Court of Federal Claims ("CFC"). BH's complaint alleged several theories of relief, including breach of contract, breach of the implied covenant of good faith and fair dealing, and relief under the doctrines of constructive or cardinal change. In response, the Government moved to dismiss the complaint for failure to state a claim upon which relief could be granted pursuant to RCFC 12(b)(6). The CFC agreed and granted the motion to dismiss as to each of BH's claims.

The CFC acknowledged that the central issue raised by the motion to dismiss was how the contract allocated between the two parties the risk of increased costs for compliance with environmental permits, like the NHDES's AOT permit. It then determined that the Permits and Responsibilities clause "clearly and unambiguously" placed the burden of obtaining and complying with state and local permits for the construction project solely on BH "without additional expense to the Government." *CFC Decision*, 106 Fed. Cl. at 312 (citations and internal quotations omitted). The CFC also rejected BH's arguments that the TDG created an obligation on the Government to engage the NHDES on BH's behalf regarding the restrictions imposed on the cut-to-fill activities. Accordingly, the CFC found that BH had not alleged a viable breach of contract claim or any violation of the implied duty of good faith and fair dealing. Additionally, because the Government did not control the actions of the NHDES, the CFC found there was no basis for imposing liability for constructive or cardinal change on the Gov-

---

[1]    The parties do not dispute that the REA was, in effect, a certified claim under the Contract Disputes Act. *See* 41 U.S.C. §§ 7103-04.

ernment. Based on these findings, the CFC concluded that BH had failed to plead facts sufficient to state a claim upon which relief could be granted and dismissed the complaint.

BH now appeals the CFC's dismissal of the complaint. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "In deciding a motion to dismiss, the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013). This rule does not apply, however, to legal conclusions. *Rack Room Shoes v. United States*, 718 F.3d 1370, 1376 (Fed. Cir. 2013). We review the grant of a motion to dismiss a complaint *de novo. Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012).

## DISCUSSION

This appeal asks us to determine whether the CFC erred by dismissing BH's complaint for failure to state a claim upon which relief can be granted because, under the terms of the contract, the Government cannot be liable for any of the costs BH incurred by complying with the NHDES's permitting requirements. BH contends that the CFC erred because the Complaint alleges three viable claims for relief: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) constructive or cardinal change. We take each of these in turn.

### 1.  Breach of Contract

A breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty.  *See Hercules, Inc. v. United States*, 24 F.3d 188, 198 (Fed. Cir. 1994); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  In making this assessment, the court must interpret the contract's provisions to ascertain whether the facts plaintiff alleges would, if true, establish a breach of contract.  *See S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss.") (citing *Kennedy Heights Apartments, Ltd., I v. United States*, 48 Fed. Cl. 574, 578 (2001)).

"Contract interpretation begins with the language of the written agreement." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).  When interpreting a contract, "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'" *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).  A contract must also be construed as a whole and "in a manner that gives meaning to all of its provisions and makes sense."  *Id.* (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)).

The CFC rejected BH's breach of contract claims because it did not find that the Government was obligated under the terms of the contract to undertake any actions with respect to permits during the project's construction.  To the contrary, the CFC determined that the Permits and Responsibilities clause clearly and unambiguously allocated the costs for complying with all permit require-

ments solely to BH because that clause expressly states that "[t]he Contractor shall, *without additional expense to the Government*, be responsible for obtaining any necessary licenses and permits, and *for complying* with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. . . ." TDG 01415(C)(1)(a)) (emphases added).

On appeal, BH alleges that the Permits and Responsibilities clause does not create an absolute bar to an equitable adjustment for breach of contract under the alleged facts. Rather, BH contends that the terms of the TDG's Consultation, Review, and Inspection provision, RFP § C.4(e), and the contract's "Changes" clause (FAR § 52.243-4) impose limits on the extent of the obligations BH assumed under the Permits and Responsibilities clause. BH contends that the Government "completely disregarded its duty to work and cooperate with BELL/HEERY involving Phasing Plan design changes and site work changes dictated by NHDES," leaving BH with "no choice but to concede to the NHDES's arbitrary and unreasonable determinations" on its own. As such, BH asserts that the Government breached the contract because it "never made any effort to engage NHDES, or to otherwise resolve the problems caused by NHDES's multiple changes" to the cut-to-fill plans. Compl. ¶ 63. We disagree. While the Permits and Responsibilities clause can be constrained by other contractual provisions that specifically limit the scope of the contractor's obligations for permitting requirements, *see Hills Materials Co. v. Rice*, 982 F.2d 514, 516-17 (Fed. Cir. 1992), none of the identified contractual provisions limit the plain allocation of responsibility to BH for complying with permits under the Permits and Responsibilities clause.

First, BH argues that the Government's failure to engage the NHDES regarding the limitations imposed on the cut-to-fill operations breached the TDG's Consulta-

tion, Review, and Inspection provision.  In relevant part, this provision states:

> 1. The Contractor shall perform the following *in conjunction with* the FBOP Project Management Team:
>
>> a. In preparing for the design for the project, consult with appropriate officials of the State or a political subdivision of a State, or both, in which the project is located and who would have jurisdiction over the project if it were not a project constructed or altered by a federal agency.
>>
>> *         *         *
>>
>> e. Allow inspections by such officials during construction of the project, in accordance with the customary schedule of inspections for construction or alteration of projects in the locality.  Scheduled inspections may take place if such officials provide to the Bureau a copy of the schedule before construction of the project has begun and provide reasonable notice of their intention to conduct any inspection before conducting such inspection.
>>
>> f. These appropriate officials may make recommendations to the Bureau concerning measures necessary to meet these requirements.  Such officials may also make recommendations concerning measures necessary which should be taken in the construction or alteration of the project to account for local conditions. Contractors, *in conjunction with* the [FBOP's] Project Management Team, are to give due consideration to such recommendations to en-

> sure that a written response is made to them.

TDG 01415(D) (emphasis added). BH argues that the phrase "in conjunction with" used in various places in this provision imposed a duty on the Government to meet and consult with the NHDES concerning the AOT permitting requirements. BH contends that the Government breached that duty by failing to intercede in the negotiations between BH and the NHDES during the cut-to-fill operations. Consequently, BH contends that the Government is liable for all of the increased costs BH incurred under the NHDES's permit requirements in excess of those that it expected to incur under the proposed one-step-cut-to-fill plan.

Although the parties dispute whether the phrase "in conjunction with" imposes any duty on the Government, we need not address this question. Even if we assume that the TDG's Consultation, Review, and Inspection provision imposes an obligation on the Government, BH has not stated a claim for relief under the subject matter covered by this provision. Subparagraphs (a) and (e) of this provision involve only *consultations* and *inspections* by State officials. Subparagraph (a) is further confined only to activities undertaken in "preparing for the design for the project." BH's complaint, however, does not make any allegations that the Government refused to consult with state officials during the design phase of the project under subparagraph (a) or that the Government disallowed an inspection by State officials under subparagraph (e). Rather, BH's complaint alleges that the Government, "did not, *during the construction phase of the project . . .* meet or consult with" the NHDES. (Compl. ¶ 48 (emphasis added).) This alleged failure to meet and consult with the NHDES during the construction phase of the project does not implicate the subject matter of subsections (a) or (e) of the TDG's Consultation, Review, and Inspection provision.

Nor does BH plead facts sufficient to state a claim against the Government under subparagraph (f) of the TDG's Consultation, Review, and Inspection provision. This subsection covers only "recommendations concerning measures which should be taken in the construction or alteration of the project to account for local conditions." It further indicates that "Contractors, in conjunction with the [FBOP's] Project Management Team, are to give due consideration to such recommendations to ensure that a written response is made to them." On its face, this subsection only deals with the obligation to "give due consideration" and "ensure that a written response is made" to "recommendations." BH's complaint does not mention any failure by the Government to consider or provide a written response to any recommendations made by the NHDES in order to comply with the permitting requirements; it complains about the actual requirements themselves. Thus, even if this subparagraph created an obligation on the Government, BH's complaint does not allege any breach of this duty by the Government in connection with the limitations placed on the cut-to-fill operations by the NHDES under the AOT permit.

Furthermore, BH's arguments regarding the obligations imposed on the Government under TDG's Consultation, Review, and Inspection provision are contrary to the express language of the TDG's Permits provision. *See* TDG Section 01415(F)(1). That TDG provision specifically assigns responsibility for complying with all terms and conditions of permits for the project to "[t]he Contractor." It does not mention any obligation on the Government regarding permits and does not use the "in conjunction with" language found in the TDG's Consultation, Review, and Inspection provision. Thus, when read in the context of all relevant provisions of the TDG as we must, *see McAbee Const., Inc.*, 97 F.3d at 1435, it is apparent that the consultations, reviews, and inspections are to be performed "in conjunction with" the Government, whereas

all obligations regarding permits were placed solely on BH.

BH also argues that RFP § C.4(e) created a contractual duty on behalf of the Government to interact with NHDES during design and construction of the project. This assertion is without merit. In relevant part, RFP § C.4(e) states:

> In preparing construction documents, the Contractor is to consult with appropriate officials of the State or a political subdivision of a State, or both, in which the Project will be located, who would have jurisdiction if it were not constructed by a federal agency . . . . These appropriate officials may make recommendations to the FBOP concerning measures which should be taken in the construction of the Project to account for local conditions . . . . In no case are the comments or recommendations of these officials to be implemented into the development documents without approval of the FBOP.

RFP § C.4(e).

Contrary to BH's assertions, there is nothing in RFP § C.4(e) that imposes a contractual obligation on the Government. On its face, it only creates contractual duties for "the Contractor." Those duties require BH to consult with state officials in preparing construction documents and mandate that BH cannot incorporate any comments or recommendations of the state officials into the construction documents without first obtaining the Government's consent. Accordingly, this provision does not limit the relevant scope of the obligations assumed by BH under the Permits and Responsibilities clause.

Finally, BH argues that its complaint supports a claim that the Government breached the "Changes" clause of FAR § 52.243-4, which was incorporated into the

contract by reference.[2]  Specifically, BH asserts that the
Government breached this clause "by not issuing a change

---

[2]    In relevant part, the Changes clause states:

(a) The Contracting Officer may, at any time,
without notice to the sureties, if any, by
written order designated or indicated to be
a change order, make changes in the work
within the general scope of the contract, in-
cluding changes—

   (1) In the specifications (including drawings
       and designs);

   (2) In the method or manner of performance
       of the work;

   (3) In the Government-furnished facilities,
       equipment, materials, services, or site;
       or

   (4)  Directing acceleration in the perfor-
       mance of the work.

(b) Any other written or oral order (which, as
used in this paragraph (b), includes direc-
tion, instruction, interpretation, or deter-
mination) from the Contracting Officer that
causes a change shall be treated as a
change order under this clause; provided,
that the Contractor gives the Contracting
Officer written notice stating (1) the date,
circumstances, and source of the order and
(2) that the Contractor regards the order as
a change order.

(c) Except as provided in this clause, no order,
statement, or conduct of the Contracting

order or equitable adjustment to cover the excess costs necessitated by the onerous, unreasonable and overzealous NHDES official, and by the FBOP's directive under Section (b) [of the Changes clause] to comply with the permitting authority's directives." We find BH's argument that the Government breached the Changes clause to be without merit.

In order for the Changes clause to apply, there must have been a change in the form of a "written or oral order . . . from the Contracting Officer that causes a change." 48 C.F.R. § 52.243-4(b); *see also* 48 C.F.R. § 52.243-4(c). BH's complaint, however, fails to allege that the Contracting Officer ever ordered BH to perform any specific work in conjunction with the cut-to-fill operations. BH only alleges that the Government ratified the changes by its silence in response to BH's various complaints. BH cannot rely on mere silence to support its allegations because any such contractual "ratification must . . . be based on a demonstrated acceptance of the contract." *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed. Cir. 1998). "Silence in and of itself is not sufficient to establish a demonstrated acceptance"

---

Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

48 C.F.R. § 52.243-4(a)-(d).

of a contractual change by the Contracting Officer. *Id.* In the absence of any change accepted by the Contracting Officer, there can be no claim for a breach of the Changes clause and, accordingly, it does not limit the obligations assumed by BH under the Privileges and Responsibilities clause.

In sum, BH has not stated a claim that the Government breached the contract because the costs for complying with the NHDES's AOT permit were allocated to BH. BH appears to accept this conclusion, at least in part, by conceding that it knowingly "accept[ed] the allocation of risk for certain costs of performing the Contract in compliance with New Hampshire law."[3] The plain language of the Permits and Responsibilities clause also unequivocally assigns *all* of the risk for complying with the permitting requirements to BH "without additional expense to the Government." Since BH's complaint does not identify any countervailing contractual duty on the Government that contradicts or renders ambiguous the express allocation of risk to BH for compliance with the NHDES's AOT permit, it has not demonstrated a cognizable claim for breach of contract.

## 2.   Breach of the Implied Covenant of Good Faith and Fair Dealing

Implied in every contract is a duty of good faith and fair dealing that requires a party to refrain from interfer-

---

[3]   Presumably, BH's bid price accounted for the risk it knowingly assumed for these costs under the contract. While BH apparently underestimated the risk associated with the costs for complying with the NHDES's AOT permit under the contract, the mere fact that BH underestimated the risk of those costs is not a sufficient basis to interpret the contract so as to reallocate those costs to the Government under the present contract.

ing with another party's performance or from acting to destroy another party's reasonable expectations regarding the fruits of the contract. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). For example, this implied covenant guarantees that the government will not eliminate or rescind contractual benefits through action that is specifically designed to reappropriate the benefits and thereby abrogate the government's obligations under the contract. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010). An implied covenant, however, cannot "create duties inconsistent with the contract's provisions." *Id.* at 831. As we have recently explained, "[a]lthough the implied duty of good faith and fair dealing attaches to every contract, what that duty entails depends in part on what that contract promises (or disclaims)." *Id.* at 830 (emphasis omitted).

BH alleges that the Government breached its obligation of good faith and fair dealing by advising BH it would be treated fairly with respect to extra work caused by NHDES's administration of the AOT permit and subsequently refusing to compensate BH for the costs, delays, and inefficiencies associated with the NHDES's unreasonable administration of the AOT permit. Compl. ¶104. BH has not, however, presented any allegations that the Government engaged in conduct that reappropriated benefits promised to BH under the contract. As noted above, the complaint does not allege facts sufficient to support a breach of contract claim against the Government for failing to engage with the NHDES regarding the limitations imposed on BH's cut-to-fill operations under the state-regulated AOT permit. Under these circumstances, the implied duties of good faith and fair dealing cannot "form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement." *Jarvis v. United States*, 43 Fed. Cl. 529, 534 (1999). Because BH's complaint

focuses on the frustrating conduct of the NHDES, an independent state agency, the allegations do not set forth a viable claim for breach of the implied covenant of good faith and fair dealing.

### 3.   Constructive or Cardinal Change

Finally, BH further alleges that the Government should be made to reimburse BH under the doctrines of constructive and cardinal change. To demonstrate a constructive change, a plaintiff must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government. *The Redland Co. v. United States*, 97 Fed. Cl. 736, 755-56 (2011) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1995)); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 774 (2005). A cardinal change is similar, but has two distinguishing features: (1) a cardinal change requires work materially different from that specified in the contract, and (2) a cardinal change amounts to an actual breach of contract. *See id.* at 755 n.9. Here, BH's complaint alleges that it was the actions of the NHDES that compelled it to modify the cut-to-fill operations. There are no allegations that the Government demanded BH to engage in any work that went beyond what BH was required to perform under the contract. Thus, under the contract, the doctrine of constructive change cannot be invoked against the Government because it did not itself effect an alteration in the work to be performed, much less an alteration "so drastic that it effectively" resulted in a cardinal change "requir[ing] the contractor to perform duties materially different from those originally bargained for." *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1543 (Fed. Cir. 1996) (citations and internal quotations omitted).

CONCLUSION

We have considered BH's remaining arguments and do not find them persuasive. We therefore affirm the CFC Decision dismissing BH's complaint.

**AFFIRMED**

COSTS

Each party shall bear its own costs for this appeal.

# United States Court of Appeals
# for the Federal Circuit

---

**BELL/HEERY, A JOINT VENTURE,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-5002

---

Appeal from the United States Court of Federal Claims in No. 11-CV-0462, Judge Lawrence J. Block.

---

MAYER, *Circuit Judge*, dissenting.

The court improperly tests the complaint filed by Bell/Heery, a Joint Venture ("Bell/Heery"), "in a crucible hotter than the plausibility standard demands." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013). Bell/Heery's complaint contained well-pled allegations that the Federal Bureau of Prisons (the "Bureau") breached two express contractual provisions when it refused to meet or consult with local officials who had imposed permitting restrictions that were contrary to accepted industry standards and sound engineering practices. Because these allegations were more than sufficient to stake out "a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), the court errs in affirming the dismissal of Bell/Heery's complaint. I therefore respectfully dissent.

## I.

In its complaint, Bell/Heery alleged that New Hampshire officials imposed permitting restrictions that were so arbitrary and unreasonable that they "devastated" its ability to perform under its contract with the Bureau. J.A. 26. Bell/Heery claimed that it could not reasonably have anticipated, at the time of bid, the capricious demands made by local permitting agents given that their restrictions were contrary to "prudent earthwork engineering practice[s]" and long-established industry standards. *Id.* at 26. It asserted, moreover, that the Bureau breached two express contractual provisions—Technical Design Guideline 01415(D) ("TDG 01415(D)") and Section C.4 of the Request for Proposals ("Section C.4")—when it refused to meet or consult with officials from the New Hampshire Department of Environmental Services ("NHDES") regarding their exceedingly onerous permitting demands.[*] J.A. 21-32. The detailed allegations contained in Bell/Heery's twenty-four page complaint were more than adequate to withstand the government's

---

[*] For example, NHDES officials required Bell/Heery to revise its design for performing site work on the project eleven different times, notwithstanding the fact that its original site-work plan was purportedly fully compliant with state regulations. J.A. 23-29. According to Bell/Heery, when excavating a site, a contractor normally is allowed to cut and clear materials from one area and then use those same materials as "fill" at another area of the project. *Id.* at 26-29. Without any apparent justification, however, NHDES officials precluded Bell/Heery from using the standard "cut-to-fill" method, instead requiring materials that had been cut from one area to be stockpiled for extended periods, thereby "caus[ing] excessive rehandling and handling of materials" and dramatically increasing costs under the contract. *Id.* at 29-30.

motion to dismiss. *See San Carlos Irrigation & Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed. Cir. 1989) (explaining that a plaintiff states a claim for breach of contract by identifying a duty arising out of that contract and alleging facts sufficient to show a breach of that duty).

Without question, neither TDG 01415(D) nor Section C.4 is a model of clarity regarding the scope of the government's obligations with respect to local permitting requirements. At the pleading stage, however, we are constrained to accept as true all well-pled factual allegations and "indulge all reasonable inferences" in a plaintiff's favor, *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001), especially when the government drafted the contract. Applying that standard, TDG 01415(D) and Section C.4 can plausibly be read to require the Bureau to confer with local permitting authorities and to approve or not any recommendations made by them.

TDG 01415(D)(1)(a) requires the Bureau, together with Bell/Heery, to "consult" with state officials when "preparing the design for the project." Section C.4 mandates that "[i]n no case are the comments or recommendations of [state and local] officials to be implemented into the developmental documents without the approval of the [Bureau]." Section C.4(e)(3). Read together, these provisions can reasonably be interpreted, at least for purposes of assessing the viability of Bell/Heery's complaint, to require the Bureau to take an active role in consulting with state permitting officials and approving their recommendations.

There is no merit to the court's assertion that TDG 01415(D) cannot support a breach of contract claim because it only applies during the "design" phase, and not during the "construction" phase, of a project. *See ante at* 13-14. The Bureau's alleged breach occurred when Bell/Heery was still clearing and excavating the site for

the project, well before any actual construction had begun. It was when Bell/Heery was revising its "Phasing Plan"—which contained detailed drawings showing its proposed plan for excavation and clearing on the project—that the Bureau allegedly failed to fulfill its duty to consult with New Hampshire officials. The Phasing Plan, as the Court of Federal Claims correctly noted, consisted of "a series of documents and drawings setting forth the *design* of [the Berlin Correctional Institution] and contemplating construction in 'phases.'" *See Bell/Heery v. United States*, 106 Fed. Cl. 300, 306 n.2 (2012) (emphasis added). Because the Bureau's failure to consult with state officials occurred during the period when Bell/Heery was revising its site-work "design," it can reasonably be inferred that the alleged breach occurred during the design, rather than the construction, phase of the project. At the very least, the question of whether the alleged breach occurred during the design phase is a disputed issue of material fact, one that must be resolved in Bell/Heery's favor when assessing the adequacy of its complaint. *See Sommers*, 241 F.3d at 1378.

In any event, Section C.4, unlike TDG 01415(D), is not limited to the design phase of the project, but instead applies when "preparing construction documents." Section C.4(e). Section C.4 specifically requires the Bureau to approve recommendations from New Hampshire officials before going forward. *See id.* ("In no case are the comments or recommendations of [state and local] officials to be implemented into the developmental documents without the approval of the [Bureau]."). Bell/Heery's allegation that the Bureau repeatedly refused to "meet or consult" with "NHDES representatives regarding NHDES comments, recommendations and requirements for the Project," J.A. 27, therefore provides an ample predicate for a breach of contract claim. The Bureau, allegedly, failed to fulfill its duty to approve or disapprove recommendations from local officials because it simply "ignored"

those recommendations, leaving Bell/Heery with "no choice but to concede to the NHDES' arbitrary and unreasonable determinations." *Id.* at 32.

## II.

In affirming the dismissal of Bell/Heery's complaint, the court places undue weight on the Permits & Responsibilities clause ("P&R clause"). That clause provides: "The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work." 48 C.F.R. § 52.236–7. While the P&R clause broadly assigns responsibility for obtaining required permits to Bell/Heery, it says nothing about whether the Bureau had an independent obligation, under TDG 01415(D) and Section C.4, to meet with state permitting authorities and approve or disapprove their recommendations.

As we have previously recognized, the scope of a contractor's liability under the P&R clause is not unbounded, but can instead be constrained by other contractual provisions that specifically limit obligations related to compliance with regulatory and permitting requirements. *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed. Cir. 1992); *see also J.E. McAmis, Inc.*, 2010-2 B.C.A. ¶ 34607, 2010 WL 4822734 (ASBCA 2010) (concluding that the P&R clause did not bar recovery where a contract identified certain "haul routes" for transporting materials and county officials later passed an ordinance restricting use of such routes); *Odebrecht Contractors, Inc.*, No. 6372, 2000 WL 975128, at *33 (ENGBCA July 6, 2000) (concluding that "the boiler plate 'Permits and Responsibilities clause'" did not preclude an equitable adjustment where a contract provided for unrestricted access to certain wells and the local regulatory authority later denied the contractor access to those wells); *Dravo Corp.*, 79-1 B.C.A

¶ 13575, 1978 WL 2244 (ENGBCA 1978) (concluding that the P&R clause did not preclude recovery where a contract specifically designated certain areas as "work/storage areas" and local officials subsequently denied a contractor access to those areas). Here, TDG 01415(D) and Section C.4 can be interpreted, at least for purposes of assessing the viability of Bell/Heery's breach of contract claim, as limiting the reach of the P&R clause and imposing a duty on the government to consult with local permitting officials and evaluate their recommendations. In affirming the dismissal of Bell/Heery's complaint, the court turns a blind eye to these provisions, effectively reading them out of the contract. *See Hills,* 982 F.2d at 516-17 (emphasizing that every government contract must be read as a whole and that the P&R clause must be applied in a manner that accounts for all provisions of the agreement between the parties); *see also Medlin Constr. Group, Ltd. v. Harvey,* 449 F.3d 1195, 1200 (Fed. Cir. 2006) (emphasizing that a government contract must be interpreted in a manner that "assure[s] that no contract provision is made inconsistent, superfluous, or redundant" (citations and internal quotation marks omitted)).

At the pleading stage, the salient inquiry is not whether Bell/Heery is likely to prevail on the merits, but instead whether it is entitled to offer evidence in support of its claims. *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and that a recovery is very remote and unlikely." (citations and internal quotation marks omitted)). The court's decision to affirm the dismissal of Bell/Heery's complaint is an unjustified effort to "collapse discovery, summary judgment and trial into the pleading stages of

[the] case." *Petro-Hunt, L.L.C. v. United States,* 90 Fed. Cl. 51, 71 (2009).