ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| AMEC Environment & Infrastructure, Inc. ) | ASBCA No. 58948 |
| ) | |
| Under Contract No. FA8903-06-D-8507 ) | |

APPEARANCES FOR THE APPELLANT:      David A. Rose, Esq.
                                    Gary L. Moser, Esq.
                                      Rose Consulting Law Firm
                                      Valdosta, GA

APPEARANCES FOR THE GOVERNMENT:     Lt Col James H. Kennedy III, USAF
                                      Air Force Chief Trial Attorney
                                    Christopher M. McNulty, Esq.
                                    Sarah L. Stanton, Esq.
                                      Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE O'CONNELL ON THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Board on the government's 8 August 2014 motion for partial summary judgment pursuant to Board Rule 7(c). Appellant, AMEC Environment & Infrastructure, Inc. (AMEC), has appealed a contracting officer's final decision denying AMEC's certified claim on a project for the design and construction of a building at Andrews Air Force base. The claim consists of two discrete issues: 1) $192,062 for the repair of damaged fiber optic cable; and 2) $28,639 in costs related to an alleged change in permitting requirements by the Maryland Department of the Environment (MDE). It is the latter issue that is the subject of the government's motion. For the reasons stated below, the government's motion is granted.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

Except as noted, the following material facts are undisputed[1]:

_____

[1] In its brief, AMEC disputes only a small number of the 77 paragraphs in the government's statement of undisputed facts (nos. 12, 21, 28-30, 32, 38, 41, 44, and 46). However, it fails to identify with specificity why it disputes these facts and, in most cases, it simply repeats what the government stated in the proposed finding. Board Rule 7(c)(2) provides that:

> The parties should explicitly state and support by specific
> evidence all facts and legal arguments necessary to sustain

1. On 12 April 2006, the Air Force awarded AMEC, then known as AMEC Earth & Environmental, Inc., a firm-fixed-price, indefinite quantity basic contract, No. FA8903-06-D-8507, for Heavy Engineering Repair and Construction (R4, tab 1).

2. On 9 July 2008, the Air Force Center for Engineering and the Environment (AFCEE) issued Request for Proposal No. FA8903-06-R-9991-R025 (the RFP), which called for the issuance of a task order under the basic contract for the design and construction of a new strategic planning and development facility at Andrews Air Force Base, Maryland (R4, tab 9a).

3. On 23 October 2008, AFCEE awarded task order No. 16 to AMEC in the amount of $28,953,273 (R4, tab 3). The task order incorporated the technical specifications of the RFP into the contract (R4, tab 3 at 10).

4. Pursuant to the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* and the National Pollutant Discharge Elimination System permit program, 33 U.S.C. § 1342, to control discharges into the navigable waters, Maryland construction projects of one acre or more of earth disturbance must obtain coverage under an Individual or General Permit for Stormwater Associated with Construction Activity. The Environmental Protection Agency has delegated to MDE the authority to issue these permits. (R4, tab 9f at 880, 1113, tab 158, ¶¶ 4-5)

5. As detailed extensively in the government's brief, the basic contract and the technical specifications incorporated into the task order contained numerous provisions that detailed the contractor's responsibility to obtain the stormwater discharge permit. Among other provisions, they incorporated FAR 52.236-7, PERMITS AND RESPONSIBILITIES (NOV 1991) (R4, tab 1 at 58, tab 9f at 81). This clause provides in relevant part:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.

6. At the time AMEC prepared its bid, and at the time that the parties executed the task order, there was a general permit in place. A general permit is a discharge

---

a party's position. Each party should cite to the record and attach any additional evidence upon which it relies.... The Board may accept a fact properly proposed and supported by one party as undisputed, unless the opposing party properly responds and establishes that it is in dispute.

2

permit that is issued to a class of dischargers. *See* Code of Maryland Regulations (COMAR) 26.08.01.01(B)(35). The amount of work involved in obtaining coverage under an existing general permit versus applying for and obtaining an individual permit is disputed. (*See, e.g.*, R4, tab 158, ¶ 7) For purposes of this motion, we will assume that there is a significant amount of additional work to obtain an individual permit.

7. The technical specifications for the RFP (as incorporated in the task order) referenced the contractor obtaining coverage under the general permit, including the following:

> 1.6.10    STORM WATER DISCHARGE PERMIT AND STORMWATER POLLUTION PREVENTION PLAN
>
> In conjunction with the Construction Officer, the Contractor shall apply for and obtain coverage under State of Maryland MDE General Permit for Discharges of Storm Water from Construction Activities when 1 or more acres (or 0.4 or more hectares) of land area are disturbed by construction or related construction support operations, including clearing, grubbing, grading, excavation, soil or gravel lay down areas, and demolition that exposes soil.

(R4, tab 9f at 81) There does not appear to be any reference in the technical specifications to an individual permit.

8. The crux of the problem here is that the existing general permit, No. MDR10, expired on 31 December 2008, a little more than two months after task order execution. This permit clearly stated that it would expire on that date.[2] (General NPDES Permit Number MDR10 (MDR10), cover page). It also stated that MDE had the authority to require an individual permit (MDR10 at 1).

9. A new General Permit for Stormwater Associated with Construction Activity was set to take effect on 1 January 2009, but it did not due to a "legal challenge" on 31 December 2008. The legal challenge resolved on 13 July 2009, but

---

[2] By Order dated 13 January 2015, the Board directed the parties to file a copy of the general permit. The Air Force filed the general permit with the Board on 27 January 2015. By letter to the Board dated 13 February 2015, AMEC confirmed that the permit filed by the Air Force was the general permit that was in effect until 31 December 2008.

3

between 1 January 2009 and 13 July 2009, MDE required all applicants to apply for and obtain an individual permit. (R4, tab 158, ¶ 4)

10. These events not only caught AMEC by surprise but, according to AMEC, both the legal challenge and the non-renewal of the general permit caught MDE by surprise as well (compl. ¶ 4). AMEC does not allege that the government knew about these events in advance and/or caused the non-renewal of the general permit.

11. MDR10 provided that a contractor that wished to obtain coverage under the permit must submit an application, referred to as a notice of intent, that contained various information about the project (MDR10 at 2-3). It is undisputed that, if AMEC or any contractor had submitted a valid notice of intent and application for coverage under the existing general permit prior to 1 January 2009, it would not have been required to apply for an individual permit (R4, tab 158, ¶ 11). It is not entirely clear when AMEC applied for an individual permit but it is undisputed that it was after 1 January (*see, e.g.*, R4, tab 15) (AMEC letter to Air Force dated 13 February 2009 stating that individual permit would be required).

12. In its proposal for the task order, AMEC represented that its "local professionals" in its northern Virginia office were "well versed in the environmental requirements for this project in Maryland." Further, it stated that its "knowledge of the local environmental regulations and permitting requirements will help us prepare...permit applications that will streamline the permitting process." (R4, tab 11 at 29-30)

13. On 26 September 2011, AMEC submitted a request for equitable adjustment seeking costs related to the permitting issue that it estimated at $26,341 (R4, tab 76 at 1-6). On 20 March 2013, AMEC submitted a certified claim seeking $28,639 related to the permitting issue (R4, tab 82). The contracting officer denied the claim in a decision dated 8 July 2013 (R4, tab 83 at 1-7).

DECISION

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a motion for summary judgment, the Board's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* at 249. The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. However, the party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

4

The most cogent explanation of AMEC's legal theory is contained in the REA it submitted to the contracting officer and later incorporated in its claim. (AMEC's complaint responds to certain paragraphs in the contracting officer's final decision but does not contain a recitation of the facts or an explanation of its legal theory. Similarly, its brief contains no meaningful recitation of the facts or law from its perspective.) According to the REA, AMEC is entitled to recover under a constructive change theory. (R4, tab 76 at 1)

The Court of Appeals for the Federal Circuit recently considered a claim for a constructive change in a case involving similar facts. In *Bell/Heery v. United States*, the contract for the design/build of a federal correctional institute required the contractor to perform cut-to-fill operations in compliance with the rules and regulations of the New Hampshire Department of Environmental Sciences. *Bell/Heery*, 739 F.3d 1324, 1326 (Fed. Cir. 2014). These requirements included obtaining and complying with an Alteration of Terrain (AOT) permit. *Id.* at 1326-27. According to the complaint, the state agency would not allow the contractor to perform cut-to-fill operations in the manner upon which the contractor calculated its bid and it imposed numerous restrictions that went beyond the standard AOT permit requirements. *Id.* at 1329. The contract in *Bell/Heery* contained the same Permits and Responsibilities clause as the contract in this case. *Id.* at 1327.

The Federal Circuit rejected the contractor's claim for a constructive change. As the Court of Appeals observed, to demonstrate a constructive change, the contractor must show: (1) that it performed work beyond the contract requirements; and (2) that the additional work was ordered, expressly or impliedly by the government. *Bell/Heery*, 739 F.3d at 1335. The Court of Appeals held that the complaint solely alleged that the actions of the state caused the contractor to incur the additional costs, and that the contractor failed to allege that the Federal Government demanded additional work beyond that required by the contract. *Id.*

The Federal Circuit's opinion in *Bell/Heery* governs this case. The additional work that AMEC contends it performed arose as a result of a change in the state permitting requirements (SOF ¶ 9). AMEC does not allege that the Federal government played any role in the non-renewal of the general permit. AMEC also does not allege that the Federal government required AMEC to perform any work beyond that required by the task order. In fact, AMEC's complaint affirmatively states that "[t]he physical requirements to implement erosion controls in accordance with MDE standards and Best Management Practices did not change" and AMEC did not request costs for any such work. To the contrary, the complaint states that its claim is solely for the additional time, expenses and professional services required to obtain the individual permit from MDE. (Compl. at 1-2) Under these facts, AMEC cannot recover for a constructive change. *Bell/Heery*, 739 F.3d at 1335.

5

To the extent that AMEC's complaint could be read as asserting a theory other than constructive change, we observe that the Federal Circuit in *Bell/Heery* also rejected the contractor's claim for relief based on a breach of contract. The Court of Federal Claims had rejected this contention, holding:

> [T]hat the Permits and Responsibilities clause clearly and unambiguously allocated the costs for complying with all permit requirements solely to BH because that clause expressly states that "[t]he Contractor shall, *without additional expense to the Government*, be responsible for obtaining any necessary licenses and permits, and *for complying* with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work...."

*Bell/Heery*, 739 F.3d at 1331. The Federal Circuit affirmed, holding that because "the Permits and Responsibilities clause...unequivocally assigns *all* of the risk for complying with the permitting requirements" to the contractor without additional cost to the government and because the contractor had failed to identify any countervailing contractual duty, the trial court correctly dismissed the contractor's breach of contract claim. *Id.* at 1334.

AMEC does not address the Permits and Responsibilities clause in its brief. However, it seems to contend that, because the contract referenced the procedures that were in place for obtaining coverage under the general permit, it should be compensated for any work beyond obtaining such coverage. But it is undisputed that AMEC was required to obtain an NPDES permit to perform the contract work and that the existing permit expired on 31 December 2008. Thus, if AMEC were unable to submit a notice of intent seeking coverage under the old permit by 31 December 2008, it would have had to obtain a permit under whatever procedures MDE implemented on 1 January 2009. AMEC seems to have assumed that those procedures would be no more burdensome than the procedures that were in place until 31 December 2008. But the government made no such representation, and the contract provided no assurance that AMEC would be compensated for increased permitting costs after 1 January 2009.

The Permits and Responsibilities clause addressed costs incurred in obtaining permits and it clearly required AMEC to obtain the necessary permits at no additional expense to the government. Because the Permits and Responsibilities clause placed this burden on the contractor, as a matter of law, it may not recover any additional expenses from the government.

## CONCLUSION

For the foregoing reasons, the government's motion for partial summary judgment is granted and the appeal is denied with respect to the claim for additional costs associated with permitting requirements.

Dated: 16 March 2015

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58948, Appeal of AMEC Environment & Infrastructure, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

7