NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ROBERTO CARABALLO, ALBERT E. MILLER, FOR THEMSELVES, AND ON BEHALF OF ALL PERSONS SIMILARLY SITUATED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-1628

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00223-SGB, Chief Judge Susan G. Braden.

---

Decided: May 30, 2017

---

ADAM HOWARD CHARNES, Kilpatrick Townsend & Stockton LLP, Dallas, TX, argued for plaintiffs-appellants. Also represented by THURSTON HOLDERNESS WEBB, Atlanta, GA.

JOHN HUGH ROBERSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.

Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., SCOTT D. AUSTIN.

---

Before PROST, *Chief Judge,* BRYSON and WALLACH, *Circuit Judges.*

PROST, *Chief Judge.*

Plaintiffs-Appellants Robert Caraballo and Albert E. Miller, for themselves, and on behalf of all persons similarly situated, appeal from the order of the United States Court of Federal Claims granting the government's motion to dismiss for failure to state a claim upon which relief can be granted. We affirm.

## BACKGROUND

The Court of Federal Claims issued its Memorandum Opinion and Final Order Regarding the Government's Motion to Dismiss based upon the following relevant facts.[1]

### I

On March 17, 1997, Roberto Caraballo and other federal employees brought suit in the United States District Court of the Virgin Islands against the United States, the United States Postal Service, and the then-Director of the United States Office of Personnel Management ("OPM"), James King ("*Caraballo I*"). J.A. 103–12. The *Caraballo I* Complaint alleged that the government paid the cost of living adjustment ("COLA") at rates lower than the levels required by law and failed to revise the COLA rates, as required by a prior settlement agreement. *Id.* COLA payments were established to provide additional compen-

---

[1] Plaintiffs do not dispute the Court of Federal Claims' factual summary. Oral Argument 0:31–56, http://www.cafc.uscourts.gov/mp2016-1628.mp3.

sation to federal employees working outside the contiguous United States based on those areas' high cost of living.

The parties eventually agreed to negotiate a settlement agreement ("Settlement Agreement") to settle *Caraballo I* in 2000. J.A. 125–30, 132. The Settlement Agreement required the United States to pay $232.5 million to a trustee and mandated that OPM issue new regulations ("New Regulations") governing the COLA program. J.A. 132. Paragraph 4 of the Settlement Agreement, entitled Procedure for Issuing New COLA Regulations and Rates Thereunder, states:

> The parties have agreed that the United States, acting primarily through its Office of Personnel Management ("OPM"), will undertake substantial revisions of the current regulations set forth at 5 C.F.R. Part 591, subpart 8, in order to conform them to the Safe Harbor Principles set forth in Exhibit A. The following steps will be taken by OPM in promulgating final new COLA regulations ("New Regulations") and rates thereunder.

J.A. 57.

The Settlement Agreement provided, however, that "it is expected, but not required by this settlement, that the New Regulations will be consistent with the Conforming Methodology." J.A. 60. Paragraph 10.2.1 defined the "Conforming Methodology" as the then-current regulations and published methodology, along with any changes made to them by the New Regulations. *Id.* The Agreement also provided in Paragraph 10.4.3 that "[i]f, at any time, OPM determines that it no longer wishes to be bound by the Conforming Methodology, it will publish notice to the class members of its decision." J.A. 63. After OPM provided notice, it would be free to issue non-conforming COLA regulations, and "[would] not incur any liability to the class members, either in damages or for

equitable relief, of any kind or degree solely on the basis that any regulation or COLA rate at issue is not reasonably consistent with the Conforming Methodology." *Id.*

The Settlement Agreement established a Survey Implementation Committee ("SIC") and a Technical Advisory Committee ("TAC"). J.A. 58. Paragraph 6 required that:

> [t]he development, implementation, and revision of the New Regulations, and the implementation of this settlement in all other respects, shall be undertaken and conducted by OPM in good faith in accordance with the principles contained in Exhibit A and in cooperation and consultation with the [SIC] and with any other committees established under Safe Harbor Principle 24 of Exhibit A [e.g., the TAC].

J.A. 57–58.

Exhibit A of the Settlement Agreement explained that members of the SIC included federal employees who would "review the plans and methodology for the survey and provide to the appropriate OPM management official(s) advice or comments." J.A. 82. "The SIC [would] continue to exist during the period from the date OPM issue[ed] final regulations to implement the settlement to the end of the first survey cycle in all COLA areas (i.e., during the first 3 years of implementation of the new regulations)." *Id.* "At the end of the second phase, the SIC [would] dissolve and OPM [would] determine the nature and extent of prospective agency and collective bargaining representatives' involvement in the COLA program by issuing regulations." *Id.* The TAC consisted of up to three members "to advise the SIC and appropriate OPM management official(s) during the First and Second Phases[,] as needed on economic and statistical issues relating to the COLA program." *Id.* "At the end of the Second Phase, the TAC [would] dissolve." *Id.*

## II

After the case settled, according to Plaintiffs, the government initially complied with its obligations under the Settlement Agreement. For example, on April 5, 2001, the President signed Executive Order 13,207, which authorized OPM to implement several portions of the Settlement Agreement. *See* Exec. Order No. 13,207, 66 Fed. Reg. 18,399 (Apr. 5, 2001).

Around April 2002, OPM drafted a legislative proposal that would replace COLA over time with locality pay. *Caraballo v. United States*, 124 Fed. Cl. 741, 744 (2016). Locality pay is based on the local costs of living as measured by the local costs of labor, and the COLA is based on comparative living costs measured through consumer price surveys. *Id.* at 744 n.6. The objective of the legislative proposal was to eliminate the COLA over time. *Id.* at 744. Congress did not enact OPM's 2002 proposed legislation. *Id.* On May 30, 2007, OPM proposed the "Locality Pay Extension Act of 2007." *Id.* Congress, again, did not enact OPM's proposed legislation. *Id.* at 744–45.

On October 28, 2009, Congress enacted the Non-Foreign AREA Act of 2009 as part of the National Defense Authorization Act for Fiscal Year 2010. *Id.* at 745. The Act reduced the COLA by 65% of the locality pay received. *Id.*

Within a year of enactment, OPM published interim regulations on the locality pay program ("2010 Interim Regulations") in the Federal Register. *Id.*; *see generally* General Schedule of Locality Pay Areas, 75 Fed. Reg. 60285, 60285–87 (OPM Sept. 30, 2010). The Interim Regulations expressly waived notice and went into effect November 1, 2010. *Caraballo*, 124 Fed. Cl. at 745; *see* 2010 Interim Regulations, 75 Fed. Reg. at 60285–86. These Regulations placed non-foreign areas in the "Rest of U.S." locality pay area ("RUS"), establishing separate

locality pay areas for Hawaii and Alaska. *Caraballo*, 124 Fed. Cl. at 745; *see* 2010 Interim Regulations, 75 Fed. Reg. at 60287. Public comments on the 2010 Interim Regulations were invited to be submitted by November 29, 2010. *Caraballo*, 124 Fed. Cl. at 745; *see* 2010 Interim Regulations, 75 Fed. Reg. at 60285.

One month later, the *Caraballo I* class counsel submitted a comment objecting to the 2010 Interim Regulations, stating that OPM's actions violated the terms of the Settlement Agreement. *Caraballo*, 124 Fed. Cl. at 745.

In a December 29, 2010, letter addressed to *Caraballo I* class counsel, a TAC member indicated that the TAC was available to advise OPM on the 2010 Interim Regulations. J.A. 217. OPM never responded to this letter. *Caraballo*, 124 Fed. Cl. at 745. The TAC member's letter indicated that he was "selected to assist in the Safe Harbor Process leading up to the Caraballo settlement, and then to participate in the further process of implementing the settlement, all of which lasted approximately 10 years *and concluded at the end of 2008*." J.A. 217 (emphasis added).

Six months later, OPM published a Notice, "rejecting all of the comments and suggestions submitted by the Caraballo Class and others." *Caraballo*, 124 Fed. Cl. at 745; *see* General Schedule Locality Pay Areas, 76 Fed. Reg. 32859, 32859 (OPM June 7, 2011). The Notice provided that the 2010 Interim Regulations would be adopted as a "final rule, with minor changes." *Caraballo*, 124 Fed. Cl. at 745; *see* Notice, 76 Fed. Reg. at 32859.

## III

On April 20, 2012, Plaintiffs filed a Motion for Leave to File Complaint for Breach of Settlement Agreement in the United States District Court of the Virgin Islands. Plaintiffs filed this motion with the district court as part of *Caraballo I* because, in its final judgment, the district

court expressly retained jurisdiction to interpret and enforce the Settlement Agreement. The district court denied the Motion, however, because it already had entered a final judgment. The district court ordered that the case be closed on January 30, 2015.

Plaintiffs then filed suit in the Court of Federal Claims designating Roberto Caraballo and Albert E. Miller as the potential class representatives. *Caraballo*, 124 Fed. Cl. at 745. They brought the Complaint on behalf of themselves, the class of individuals certified by the district court in *Caraballo I*, and all other persons within the definition of the *Caraballo I* class. *Id.* at 745–46. The Complaint contained two counts: (1) breach of the Settlement Agreement; and (2) breach of the express and implied covenant of good faith and fair dealing. *Id.* at 746.

The government filed a Motion to Dismiss, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims. *Id.* The government moved to dismiss Plaintiffs' claims on the grounds that (1) the court lacked jurisdiction to hear Plaintiffs' claims; (2) Plaintiffs' claims were barred under the doctrine of res judicata; and (3) Plaintiffs' claims failed to state a claim upon which relief can be granted.

The Court of Federal Claims determined that, although it had jurisdiction and res judicata did not bar it from adjudicating Plaintiffs' claims, the Complaint failed to state a claim for breach of the Settlement Agreement and failed to state a claim for breach of the duty of good faith and fair dealing. The Court of Federal Claims therefore granted the government's Motion to Dismiss. *Id.* at 754. Plaintiffs timely appealed.

We have jurisdiction over an appeal from a final decision of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I

Before reaching the merits of Plaintiffs' appeal, we must first address the government's jurisdictional and res judicata challenges to Plaintiffs' claims. On appeal, the government first challenges the Court of Federal Claims' jurisdiction over the suit, contending that the Settlement Agreement does not provide for monetary damages in the event of the United States' breach. We review de novo the Court of Federal Claims' decision that it possessed subject matter jurisdiction over the Plaintiffs' claim. *Holmes v. United States*, 657 F.3d 1303, 1309 (Fed. Cir. 2011).

The Tucker Act establishes the Court of Federal Claims' jurisdiction, providing it with "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). While a plaintiff generally must identify a money-mandating source of substantive law to bring a claim under the Tucker Act, "in a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." *Holmes*, 657 F.3d at 1314. The existence of a contract, however, does not necessarily mean that Tucker Act jurisdiction exists. *Id.* "A contract expressly disavowing money damages would not give rise to Tucker Act jurisdiction." *Id.* The government argues that the Court of Federal Claims did not have jurisdiction over the claim because the Settlement Agreement disavows money damages.

The Court of Federal Claims concluded that, "[a]lthough the court interprets paragraph 11 as relieving the Government from further monetary liability in the *Caraballo I* litigation, paragraph 11 does not disavow

money damages for the Government's breach of other Settlement Agreement terms." *Caraballo*, 124 Fed. Cl. at 748. We agree. Plaintiffs' claim for breach of the Settlement Agreement, if proven, provides for money damages against the government. Although the Settlement Agreement states that the government would "face[] no further monetary liability in this case," J.A. 64, the Court of Federal Claims correctly held that this language applied only to the claims that the Settlement Agreement resolved and not to breaches of the Settlement Agreement itself. Thus, jurisdiction was proper in the Court of Federal Claims pursuant to the Tucker Act.[2]

The government also challenges the Court of Federal Claims' decision that the suit is not barred by res judicata. Under the doctrine of res judicata, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v.*

---

[2] The government argued before the district court that that court also lacked jurisdiction over Plaintiffs' breach of contract claim because Plaintiffs sought monetary relief in excess of $10,000. United States' Opposition to Plaintiffs' Rule 15 Motion at 6, *Caraballo v. United States*, No. 97-0027 (D.V.I. June 5, 2012), ECF No. 131. "Regrettably, this is not the first case in which the Government urged a district court to dismiss a case on the ground that jurisdiction belonged in the Court of Federal Claims and then, after suit was brought in the Court of Federal Claims, again urged dismissal on the ground that the Court of Federal Claims lacked jurisdiction." *VanDesande v. United States*, 673 F.3d 1342, 1351 (Fed. Cir. 2012) (collecting cases). As we have previously noted, such "shifting positions [lead] to an unnecessary waste of money and judicial resources, and are manifestly unfair to the litigant." *Id.*

*Moitie*, 452 U.S. 394, 398 (1981). We review de novo the court's finding that a claim is not barred by res judicata. *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003).

The government argues that Plaintiffs' claims should be dismissed because they were barred by res judicata based on the denial of Plaintiffs' Motion to Amend in *Caraballo I.* The government maintains, among other things, that the district court's denial of Plaintiffs' Motion to Amend constitutes a final judgment for res judicata purposes. Denial of a motion to amend can only have res judicata effect, however, when the proposed amended claims are claims that could have been alleged when the plaintiff filed the initial complaint. *See, e.g.*, *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 400 F.3d 139, 143 (2d Cir. 2005) (rejecting the argument that res judicata applied to the denial of a motion to amend to add claims arising entirely out of conduct postdating the filing of the first action); *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139–40 (2d Cir. 2000) (explaining that denial of a motion to amend will not operate as a judgment on the merits for claim preclusion purposes when the claims could not have been brought in the initial complaint). Here, Plaintiffs could not have raised their breach of settlement agreement claims in *Caraballo I* before they entered into any settlement agreement. Accordingly, we conclude that the district court's denial of Plaintiff's Motion to Amend does not have res judicata effect and, thus, Plaintiffs' suit is not barred by res judicata. We next turn to the merits of Plaintiffs' issues on appeal.

## II

"Whether the Claims Court properly dismissed a complaint for failure to state a claim upon which relief could be granted is an issue of law which we review de novo." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014) (quotation marks and citations omitted). "In deciding a motion to dismiss, the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Id.*

In their Complaint, Plaintiffs alleged two claims. First, Plaintiffs alleged that the government breached the express terms of the Settlement Agreement. Second, Plaintiffs alleged that the government breached the implied and express covenants of good faith and fair dealing. The Court of Federal Claims dismissed both of Plaintiffs' claims for failing to state a claim upon which relief could be granted. We address each in turn.

## A

Plaintiffs allege that the government breached the express terms of the Settlement Agreement. Specifically, they allege that by enacting the Non-Foreign AREA Act and its corresponding regulations, the government violated (1) Paragraphs 6 and 7 of the Settlement Agreement by not consulting the SIC and the TAC; and (2) Paragraph 10.4.3 of the Settlement Agreement by not providing prior notice to the class. On appeal, Plaintiffs argue that the Court of Federal Claims erred in dismissing Plaintiffs' breach of contract claim based on both alleged violations. We disagree.

## 1

Plaintiffs first argue that the Court of Federal Claims erred in dismissing Plaintiffs' breach of contract claim based on the government's failure to consult with the SIC and the TAC.

Paragraphs 6 and 7 of the Settlement Agreement provides, in relevant part:

> Employee Involvement Structure.  The develop-
> ment, implementation, and revision of the New
> Regulations, and the implementation of this set-
> tlement in all other respects, shall be undertaken
> and conducted by OPM in good faith in accordance
> with the principles contained in Exhibit A and in
> cooperation and consultation with the [SIC] and
> with any other committees established under Safe
> Harbor Principle 24 of Exhibit A [e.g., the TAC].

J.A. 57–58.  Paragraph 4 defines the term "New Regula-
tions" as "final new COLA regulations."  J.A. 57.  Plain-
tiffs argue that OPM violated this express provision of the
Settlement Agreement by not consulting with the SIC or
the TAC prior to the enactment of the Non-Foreign AREA
Act and its corresponding regulations.  The government
concedes that OPM did not consult with either committee
but maintains that it was not required to do so under the
Settlement Agreement.

We conclude that based on the plain language of the
Settlement Agreement, OPM was not required to consult
the SIC or the TAC prior to the enactment of the Non-
Foreign AREA Act and its corresponding regulations.

The Settlement Agreement establishes that the "SIC[]
and the TAC will advise OPM as it prepares both its
proposed and final regulations" to implement the settle-
ment.  J.A. 81.  The Settlement Agreement continues that

> [t]he SIC will continue to exist during the period
> from the date OPM issues final regulations to im-
> plement the settlement to the end of the first sur-
> vey cycle in all COLA areas (i.e., during the first 3
> years of implementation of the new regula-
> tions). . . .  Prior to each survey conducted in this
> cycle, the SIC will review the plans and methodol-
> ogy for the survey and provide to the appropriate
> OPM management official(s) advice or comments.
> Following each survey, the SIC will again meet to

review the analysis of the results of the COLA surveys. . . . At the end of the second phase, the SIC will dissolve.

*Id.* The agreement describes the role of the TAC as follows: "A one to three member TAC will be established to advise the SIC and the appropriate OPM management official(s) during the First and Second Phases as needed on economic and statistical issues relating to the COLA program." *Id.* The TAC also was set to dissolve at the end of the Second Phase. *Id.*

It is clear that the Settlement Agreement established the SIC and TAC to advise OPM on issues pertaining to preparing the COLA regulations, determining COLA rates, planning the COLA surveys, and analyzing the results thereof. Once these activities were complete, however, the committees were to be dissolved.

Plaintiffs argue that OPM changed the COLA rates by way of the Non-Foreign AREA Act's adoption of a yearly reduction of the existing COLA rates to phase out COLA payments over time. *See* 5 U.S.C. § 5941(c). It is this yearly change to the COLA rate, without consulting the SIC and TAC, Plaintiffs assert, that breached the Settlement Agreement. We are not persuaded. In reality, the Non-Foreign AREA Act functions to fix COLA at the 2009 COLA rates and reduce that rate by a pre-determined amount each year in order to implement the locality pay system to replace the COLA program. *Id.* § 5941(c)(2)(B) (Each adjusted COLA rate "shall be computed by . . . subtracting 65 percent of the applicable locality-based comparability pay percentage" from the fixed 2009 COLA rate.); *see also* Oral Argument 24:02–25:05 (THE COURT: "[T]he 2009 COLA [is] the fixed number that had already been determined, so it's not as if there was a new determination of a COLA each year as you transition from the old [COLA] system to the new [locality pay system]. Is that right?" GOVERNMENT: "That is exactly right, your

honor."). Thus, contrary to Plaintiffs' contentions, the COLA rates are not determined anew each year. The Non-Foreign AREA Act and its corresponding regulations, therefore, do not involve generating new COLA regulations, determining COLA rates, or conducting COLA surveys.

Further, Paragraph 4 of the Settlement Agreement indicates that, at the time of the agreement, OPM was expected to "undertake substantial revisions of the [then] current regulations set forth at 5 C.F.R. Part 591, subpart 8, in order to conform them to the Safe Harbor Principles set forth in Exhibit A." J.A. 57. These revisions would become the "final new COLA regulations," i.e., the New Regulations. Once "OPM issue[d these] final regulations to implement the settlement," J.A. 82, OPM's obligations under the Settlement Agreement with respect to generating new COLA regulations, including the obligation to consult with SIC and TAC, were complete.

Thus, by neglecting to consult with these committees—which, under the Settlement Agreement, were to be dissolved years prior—OPM did not breach the Settlement Agreement. Indeed, the Non-Foreign AREA Act and its corresponding regulations did not involve generating new COLA regulations, determining COLA rates, or conducting COLA surveys.

This is fully consistent with Paragraph 10.4.3 of the Settlement Agreement, which does not require OPM to consult with the committees in the process of deciding *not to be bound* by the Conforming Methodology. The trial court also recognized that: "[O]nce OPM provided notice that it no longer intended to be bound by the Conforming Methodology, OPM no longer needed to consult with the SIC and/or TAC." *Caraballo*, 124 Fed. Cl. at 754 n.10.

In sum, we conclude that, under the circumstances, OPM was not required to consult the SIC or the TAC and,

thus, did not breach the Settlement Agreement by failing to do so.[3]

2

Plaintiffs also argue that the Court of Federal Claims erred in dismissing Plaintiffs' breach of contract claim based on the government's failure to give notice to the class members that it no longer intended to be bound by the Conforming Methodology. We disagree.

Paragraph 10.4.3 of the Settlement Agreement requires the government to provide notice to the class before it stops adhering to the Conforming Methodology. Specifically, the Settlement Agreement requires that:

> [i]f, at any time, OPM determines that it no longer wishes to be bound by the Conforming Methodology, it will publish notice *to the class members* of its decision. OPM may then revise its regulations or

---

[3] The Court of Federal Claims concluded, in part, that the government's failure to consult the SIC and/or TAC was not a material breach as it did not go to the "essence of the contract." *Caraballo*, 124 Fed. Cl. at 753. The court also concluded, however, that because the breach was not material, it could not support a claim for breach of contract. *Id.* This is incorrect. A breach need not be material in order to support a claim for breach of contract. *See, e.g.*, Restatement (Second) of Contracts § 236 (1981) ("[E]very breach gives rise to a claim for damages[.]"); *id.* § 241 ("Even if not material, the failure may be a breach and give rise to a claim for damages for partial breach."). Of course, we may still affirm the Court of Federal Claims' judgment on this issue as we review judgments, not opinions, and so we need not focus on the methodology used by the Court of Federal Claims. *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008).

> set COLA rates in a manner that is not consistent with the Conforming Methodology.

J.A. 63 (emphasis added).

Plaintiffs maintain that OPM breached the Settlement Agreement because it did not provide class members with notice *before* issuing new regulations that departed from the Conforming Methodology. Plaintiffs also argue that it was not sufficient for OPM to give notice to the public at large or to Plaintiffs' counsel, but that under Paragraph 10.4.3, they were required to provide notice "to the class members."

We agree with the Court of Federal Claims and conclude that OPM did not act in violation of Paragraph 10.4.3 of the Settlement Agreement. *Caraballo*, 124 Fed. Cl. at 752. OPM provided adequate notice to the class members by publishing the 2010 Interim Regulations in the Federal Register. *See Higashi v. United States*, 225 F.3d 1343, 1349 (Fed. Cir. 2000) ("The publication of rules and regulations in the Federal Register gives legal notice of their contents and those subject to, or affected by, them, regardless of actual knowledge of what is in the [r]egulations or of the hardship resulting from innocent ignorance." (internal quotation marks and citation omitted)). Also, the November 26, 2010 comment submitted to OPM by the *Caraballo I* class counsel evidences that Plaintiffs received actual notice. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 92–93 (1990) ("Under our system of representative litigation, each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." (internal quotation marks and citation omitted)).

## B

Plaintiffs also allege that the government breached the implied and express covenants of good faith and fair

dealing by eliminating COLA through the passage of the Non-Foreign AREA Act and its corresponding regulations and by implementing the regulations without considering the terms of the Settlement Agreement. On appeal, Plaintiffs argue that the Court of Federal Claims erred in dismissing Plaintiffs' claim for breach of the covenant of good faith and fair dealing. Again, we disagree with Plaintiffs.

"'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.'" *Metcalf Const. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 205 (1981)). This duty prevents a party from acting in a way that is inconsistent with the contract's purpose and would deprive the other party of the contemplated value. *Id.* at 991. That duty, however, "'cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.'" *Id.* (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010)). Thus, "an act will not be found to violate the duty . . . if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision." *Id.*

Plaintiffs maintain that their continued receipt of a COLA payment was the underlying premise of the entire Settlement Agreement. Plaintiffs argue that, while the government could abandon the Conforming Methodology if it complied with the procedure set forth in the Settlement Agreement, the government did not have discretion to eliminate COLA altogether. The government, for its part, contends that the "original bargain" provided OPM with the right to issue new compensation-related regulations replacing COLA with a locality pay regime.

We agree with the Court of Federal Claims and conclude that Plaintiffs did not bargain for the COLA regulatory regime to be maintained in perpetuity. *Caraballo*, 124 Fed. Cl. at 753. Rather, they bargained for a one-time lump-sum payment to satisfy backpay claims prior to October 1, 1990 and for a Conforming Methodology that OPM was "expected, but not required," to follow when determining COLA. *Id.*

It is clear from the language of the Settlement Agreement that OPM was "not required" to promulgate regulations consistent with the Conforming Methodology in the first place, J.A. 60, and, even if it were, that OPM could subsequently depart from the Conforming Methodology "at any time," J.A. 63. Such a departure, of course, logically includes eliminating COLA altogether. OPM's departure from the Conforming Methodology and enactment of the new locality pay scheme, therefore, were not inconsistent with the contract's purpose nor did they deprive Plaintiffs of the contemplated value of settlement. Accordingly, OPM's acts did not violate the duty of good faith and fair dealing. A holding to the contrary would be at odds with the terms of the original bargain. *Id.*

CONCLUSION

For the reasons set forth, we affirm the decision of the Court of Federal Claims.

**AFFIRMED**